DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, Jennifer Harm, appeals the decision of the Summit County Court of Common Pleas, Domestic Relations Division, which terminated a shared parenting plan between the parties and modified her visitation rights with the parties' minor child, N.H. We affirm.
 I. {¶ 2} Appellant, Jennifer Harm ("Mother"), and Appellee, Kurt Hammond ("Father"), were divorced on September 24, 2004, and a shared parenting plan was incorporated into their Decree of Divorce. Pursuant to the shared parenting plan, their son, N.H., born September 16, 2001, visited with each parent on a two-month *Page 2 
rotation schedule. Father was the residential parent for school purposes. Father lives in Florida and Mother lives in Ohio. Once N.H. reached his current age of six years, each party filed motions to reallocate parental rights and responsibilities to them because N.H. was now of the age to enroll in school and the two-month rotation schedule was no longer workable.
 {¶ 3} On April 18, 2007, the matter was heard by the magistrate. The magistrate issued his decision on June 7, 2007 ("Magistrate's Decision"), which the trial court adopted on the same day. Mother objected to the Magistrate's Decision on June 19, 2007. Father replied thereto on August 3, 2007, and Mother filed a supplemental brief on August 27, 2007. On November 2, 2007, the trial court overruled Mother's objections relevant to this appeal and entered judgment adopting the Magistrate's Decision ("Judgment Entry").
 {¶ 4} Mother timely appealed the Judgment Entry, raising three assignments of error. We have combined Mother's assignments of error to facilitate our review.
 II. ASSIGNMENT OF ERROR I "WHETHER THE LOWER COURT ERRED IN FAILING TO CONSIDER THE BEST INTEREST OF THE CHILD IN DETERMINING THAT [FATHER] SHOULD BE THE SOLE RESIDENTIAL PARENT AND LEGAL CUSTODIAN."
 ASSIGNMENT OF ERROR II *Page 3 "WHETHER THE LOWER COURT ERRED IN CONSIDERING IMPROPER EVIDENCE IN DETERMINING THAT [FATHER] SHOULD BE THE SOLE RESIDENTIAL PARENT AND LEGAL CUSTODIAN."
 ASSIGNMENT OF ERROR III "WHETHER THE LOWER COURT ERRED IN TERMINATING [MOTHER'S] UNSUPERVISED VISITATION RIGHTS AND UNMONITORED RIGHTS TO COMMUNICATE WITH HER MINOR SON BY TELEPHONE."
 {¶ 5} Mother sets forth the three assignments of error above only on the "Assignments of Error" page of her brief. Mother has not reiterated these assignments of error in the body of the brief and does not argue each separately. Mother argues in her brief that the trial court erred when it determined that it would be in the best interest of N.H. (1) for Father to be the sole residential parent; (2) for Mother's visitation with N.H. to be supervised; and (3) for Father to be permitted to monitor Mother's telephone calls with N.H.
 {¶ 6} Mother has failed to set forth a specific argument in support of her second assignment of error. An appellant bears the burden of affirmatively demonstrating the error on appeal, and substantiating his or her arguments in support. Angle v. W. Res. Mut. Ins. Co. (Sept. 16, 1998), 9th Dist. No. 2729-M, at *1; Frecska v. Frecska (Oct. 1, 1997), 9th Dist. No. 96CA0086, at *2. See, also, App.R. 16(A)(7) and Loc.R. 7(A)(6). Moreover, "[i]f an argument exists that can support this assignment of error, it is not this [C]ourt's duty to root it out."Cardone v. Cardone (May 6, 1998), 9th Dist. Nos. 18349 and 18673, at *8. As *Page 4 
Mother has failed to meet her burden with regard to her second assignment of error, we decline to address it.
 {¶ 7} "This Court reviews the trial court's termination of a shared parenting plan for an abuse of discretion." Stanley v. Stanley, 9th Dist. No. 23427, 2007-Ohio-2740, at ¶ 7, citing Morrison v.Morrison (Nov. 15, 2000), 9th Dist. No. 00CA0009, at *2; Masters v.Masters (1994), 69 Ohio St.3d 83, 85. "An abuse of discretion implies that the trial court's decision was arbitrary, unreasonable, or unconscionable." Stanley at ¶ 7, citing Miller v. Miller (1988),37 Ohio St.3d 71, 73. "An appellate court may not substitute its judgment for that of the trial court when applying the abuse of discretion standard."Stanley at ¶ 7, citing Pons v. Ohio State Med. Bd. (1993),66 Ohio St.3d 619, 621.
 {¶ 8} "The court may terminate a prior final shared parenting decree that includes a shared parenting plan approved under division (D)(1)(a)(ii) or (iii) of this section if it determines, upon its own motion or upon the request of one or both parents, that shared parenting is not in the best interest of the children." R.C. 3109.04(E)(2)(c). R.C. 3109.04(F)(2) provides factors the trial court shall consider in addition to all relevant factors, including, but not limited to, the factors set forth in R.C. 3109.04(F)(1), in determining whether shared parenting is in the best interest of the children:
 "(a) The ability of the parents to cooperate and make decisions jointly, with respect to the children; *Page 5 
 "(b) The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;
 "(c) Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;
 "(d) The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting;
 "(e) The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem." R.C. 3109.04(F)(2).
 {¶ 9} "Upon the termination of a prior final shared parenting decree under division (E)(2)(c) of this section, the court shall proceed and issue a modified decree for the allocation of parental rights and responsibilities for the care of the children under the standards applicable under divisions (A), (B), and (C) of this section as if no decree for shared parenting had been granted and as if no request for shared parenting ever had been made." R.C. 3109.04(E)(2)(d).
 {¶ 10} "When making the allocation of the parental rights and responsibilities for the care of the children under this section in an original proceeding or in any proceeding for modification of a prior order of the court making the allocation, the court shall take into account that which would be in the best interest of the children." R.C.3109.04(B)(1).
 {¶ 11} To determine what is in the best interest of the child for the purpose of determining how to reallocate parental rights, the trial court must consider the factors set forth in R.C. 3109.04(F)(1).Stanley at ¶ 10. R.C. 3109.04(F)(1) states, in relevant part: *Page 6 
 "(F)(1) In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:
 "(a) The wishes of the child's parents regarding the child's care;
 "(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
 "(d) The child's adjustment to the child's home, school, and community;
 "(e) The mental and physical health of all persons involved in the situation;
 "(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;
 "(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;
 "(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;
 "(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state."
 {¶ 12} The Magistrate's Decision indicates that he considered the statutory factors set forth in R.C. 3109.04 and determined that his decision was in the best interest of N.H. Thus, we will review this matter to determine if the trial court *Page 7 
abused its discretion in determining, upon consideration of the R.C.3109.04(F)(1) and (2) factors, that it was in the best interest of N.H. to terminate the shared parenting plan, for Father to be named the residential parent, for Mother to be allocated supervised visitation, and for Mother's telephone communication with N.H. to be monitored.
 {¶ 13} At the April 18, 2007 hearing, several witnesses testified, including Mother, Mother's therapists, the guardian ad litem, and the family court supervisor. Father did not testify and was present for only a portion of the hearing.
 {¶ 14} Jeffrey Durr is a psychologist and counselor who treated Mother. Mother engaged him directly for treatment. Durr testified that he had treated Mother on 34 occasions over a two and one-half year period, or about once every three weeks. He stated that Mother was consistent in her attendance, motivated and complied with his suggestions.
 {¶ 15} Durr explained that Mother sought treatment because she was "really struggling emotionally when * * * [N.H.] would go to Florida." She was going through a "grieving process." Durr stated that Mother was always concerned she would not have time with N.H. Later, Durr explained, they also discussed issues related to Father's alleged abuse of N.H. Durr testified that Mother told him that N.H. had reported the abuse to her and she was visibly concerned. Durr explained that he and Mother had a goal of creating a plan that would allow Mother to *Page 8 
determine the reality of the allegations and appropriately respond. Another goal of therapy, explained Durr, was to help Mother become "less reactive, more focused, more centered on her decision-making[.]" Finally, Durr explained that he and Mother also worked toward making Mother more assertive.
 {¶ 16} Durr testified that Mother indicated to him she has a good relationship with her other son, J.H., and that N.H. and J.H. are close and have a "positive relationship." Durr testified that he also met N.H. and Harm's mother and found their interaction with each other to be appropriate. Durr indicated that Mother had told him that Father would sometimes refuse to let her talk to N.H. by telephone when N.H. was with Father in Florida and/or that Father was monitoring her calls with N.H. Durr stated that Mother was upset by this. Durr said that Mother did not describe Father in a "very good light[.]" Durr also noted that he had asked Mother about her live-in boyfriend, David, and she told him that David treated the boys appropriately. Durr testified that N.H. did not have any problems at preschool and that Mother took N.H. to church.
 {¶ 17} Durr diagnosed Mother with adjustment disorder, which he considered to be "the most benign diagnosis you can give people, because we all adjust to something." Durr agreed with Michael Smith, the physician who performed a psychological evaluation on Mother, that Mother did not have any severe pathology and denied that Smith diagnosed Mother as having a borderline personality. Durr explained that they "made some gains" in the treatment goals as *Page 9 
Mother became more centered and less reactive. Durr further testified that Mother "made some gains regarding insight" and is now "less dramatic." He stated that Mother is "in many ways, a real traditional mom" and is "very caring" and "very involved." Durr also testified that he would be comfortable with Mother's involvement with N.H. and that Mother's involvement with N.H. is critical at this young age. Smith did not testify nor was a report produced from Smith introduced into the record.
 {¶ 18} Durr testified that if there was concern about Mother alienating N.H. from Father, such conduct needed to be controlled; however, Durr stated that he was unaware of these allegations until just prior to the hearing when he read the other expert reports. Durr did not testify that he thought that Mother's visits with N.H. should be supervised, but he did note that if Mother had a goal to devalue Father, even if unconsciously, that treatment would be needed to deal with such conduct. Durr indicated that he has a good relationship with Mother and that he would be willing to continue to work with her. Durr believed that Mother could continue to make gains.
 {¶ 19} On cross-examination, Durr testified that Mother did not tell him anything about her live-in boyfriend having a criminal background, which would have been important for him to know. Durr indicated that he knew that Robin Tener of Northeastern Behavior Health investigated Mother's allegations that *Page 10 
Father had abused N.H. and found them to be unsubstantiated. If Durr generated a written report, it was not part of the record on appeal.
 {¶ 20} Harvey Miller was appointed as N.H.'s guardian ad litem. Miller testified that prior to making his recommendation, he spoke to Mother, Father, N.H. and N.H.'s paternal grandfather. He did not speak with J.H., Durr, or any other grandparents. Miller explained that, although he did not speak with J.H. or observe the brothers' interactions with each other, he believed N.H.'s relationship with J.H. to be a good one based on conversations with N.H. Miller was not aware until the day of the hearing that Mother's boyfriend, David, had a criminal record. Miller indicated that this information would be relevant to his recommendation.
 {¶ 21} Miller stated that Mother told him she was very close with her family and he knew many of them lived close to Mother's home. Miller also indicated that Mother's parents had been married for 46 years while Father's parents had been married and divorced numerous times. Miller testified that it was his understanding that Father had no relationship with his mother until he was a teenager.
 {¶ 22} Miller testified that he visited with N.H. at his Mother's home. Miller described Mother's home as being a "typical urban home" in a "decent neighborhood" with a "park across the street." He stated that Mother's home was "well-kept, appropriately furnished," and "clean;" the basement was redone into a *Page 11 
playroom for the boys. His visit with N.H. went well; however, Miller testified, he decided to meet with N.H. again in his office because he was "sort of shocked by some of the things [N.H.] was saying to [him] at the tail end of [his] meeting with [N.H.] at [Mother's] home" and because N.H.'s statements had seemed so rehearsed. Miller then described N.H.'s shocking statements made during his visit with N.H. in Mother's home.
 {¶ 23} Miller indicated that as he was getting ready to leave Mother's home, N.H. became agitated and said, "I got — I need to tell what I need to tell you. I got to tell you some stuff." After that, Miller indicated, N.H. "just rattled off a whole string of things[.]" Among the things that N.H. told Miller was that "[Father] hurt me. [Father] hurt my willy; I don't want to live in Florida; I want to live with my mother." N.H. also told him that "Kurt punches me;" "Kurt hates me;" and "I want Kurt to die." Miller indicated that N.H. was "absolutely looking at [Mother] for * * * support and encouragement for what he was saying." He then said to Mother, "[c]an I have my prize now?" "With each comment, he looked to her." Miller testified that he reported this exchange to Susanne Davis of Family Court Services and it was his understanding that Florida and Ohio both investigated claims of abuse against Father.
 {¶ 24} Miller explained that he arranged for the second meeting with N.H. in his office in hopes that his initial reaction about the rehearsed nature of N.H.'s comments during their first meeting at Mother's home was wrong. Miller testified *Page 12 
that the second meeting only reinforced his initial belief, although he also admitted that N.H. never told him that Mother or anyone else told him to say any particular thing and N.H. had ample opportunity to advise him of any coercion without feeling like he was tattling on Mother. N.H. also asked Miller if he would take him back home to Ohio when he came to visit him in Florida and suggested that Miller could sneak him on the airplane. Miller stated that during this interview with N.H., he "bounced from subject to subject pretty quickly." Miller believed that N.H. "had an agenda that he felt he had to get out and that he would blurt out little tidbits about different subjects, and then move on to the next one and the next one, to make sure he got his points across to me."
 {¶ 25} Regarding Father's home and living situation, Miller testified that N.H. told him that Father's roommate, Phil, did not like him and that he and Father spent time with Paula, Father's girlfriend. During this visit, Miller testified that N.H. told him he would miss his family in Ohio if he lived in Florida, that he did not like Florida, and that Father's house was "stinky[.]" N.H. never told him he wanted to live with Father. Miller noted that while N.H. referred to Father as "Kurt" in Ohio, he referred to him as "Dad" during their Florida visit. Miller testified that Father's home was "well-kept" and clean, however, N.H. took credit for the cleanliness. Miller also testified that "Phil" does not exist. Finally, Miller testified that he expected Father to be angry but found him to be very civil and reasonably expressed concern that Mother was brainwashing N.H. *Page 13 
 {¶ 26} Miller described N.H. as being able to "speak well," but had "some question" that N.H. clearly expressed his "own feelings, emotions, beliefs and experience." Miller testified that he believes N.H. loves both parents, likes having homes in both Ohio and Florida and enjoys his time in both places. N.H. never made any negative comments about Mother to him. Miller stated that he believed both parties have complied with the shared parenting plan, but that he was aware of Mother's concern that Father prevented her from having telephone communication with N.H. when N.H. was in Florida.
 {¶ 27} Finally, Miller testified that he did not "know how clear [he was] on" his recommendation. He stated that he believes that N.H. should visit with Mother as frequently as possible but that such visits needed to be supervised because Mother does not realize how her actions (in programming N.H. to report certain things) affect N.H. Miller admitted that severing N.H.'s relationship with his mother too dramatically would damage N.H., but that "its definitely damaging to leave the current arrangement in place." Miller testified that the supervision should be "tied to Mom's counseling with Mr. Durr" and the supervised visitation coordinator's reports of Mother's interaction with N.H. Miller acknowledged that his recommendation was vague because he did not know how to actually implement supervised visitation given the distance between the parties.
 {¶ 28} Susanne Davis is an evaluator with Family Court Services. Davis testified that she was initially involved with this case when the parties divorced *Page 14 
and then became involved again in July 2006. Davis explained that she interviewed the parties together on August 14, 2006. Father participated in the interview by phone. Davis also interviewed N.H. outside the presence of either parent. Davis acknowledged that she was aware of both Father's and Mother's romantic relationships and that Father had lived with three different women since his divorce in 2004. Davis testified that a Florida police department had contacted her about a verbal dispute at Father's home in August 2004, but she did not know the details. Davis stated that she was also aware that Mother had asked police to check on N.H. at Father's home on October 11, 2006, because she had not been able to talk to N.H. for an extended period of time.
 {¶ 29} Davis indicated that Father told her he had decided not to facilitate phone calls because Mother had "threatened to kill him and called him a homosexual in front of [N.H.]" for which he "had to involve security at the airport." Davis stated that Father told him that N.H. "needed some protection from the emotional abuse." Father further told Davis that he would allow phone contact but would use a speakerphone so he could monitor what was being said.
 {¶ 30} Davis testified that she spoke with Durr on several occasions and that he had advised her that Mother "consistently attended [counseling] appointments * * * [and] had come a long way[.]" Durr told her that Mother's general maturity level had improved, her parenting skills were adequate, that Mother was nurturing, and that Durr was comfortable with Mother parenting N.H. *Page 15 
 {¶ 31} Davis testified about her interview with N.H. on August 10, 2006, and stated that N.H. was comfortable and talkative throughout. Davis stated that N.H. called Father by his first name, "Kurt", during the interview. N.H. also told her that Father was not his dad and that his new dad is Dave (Mother's boyfriend). Davis stated that N.H. told her that "[Father] calls [Mother] a freaking stupid idiot." N.H. also told her that he did not want to go back to visit Father and that Father was "the devil." Davis noted that Mother had also referred to Father as the "devil" during the couple's divorce.
 {¶ 32} Davis explained that she placed a call to Summit County Children Services because of allegations N.H. made about sexual abuse against Father. Davis explained that both the Ohio and Florida agencies were involved in the investigation, which included three sex abuse exams before N.H. reached the age of five, and that to her knowledge the allegations were unsubstantiated. Robin Tener, who investigated these allegations in Ohio, told her that N.H.'s comments about the abuse changed every time she spoke to him. Tener told her that N.H.'s "`comments change each time he is interviewed, and his allegations become increasingly fantastic.'" Davis testified that a woman by the name of Miss Sanderson reported that N.H. told her, "`My mom says that my dad is hurting me, but he really doesn't.'" Neither Tener nor Sanderson testified at the hearing.
 {¶ 33} Davis further testified that N.H. had surgery while he was with Father in July of 2005, and that Mother told her that Father did not tell her about *Page 16 
the surgery until after it was over. Davis stated that Mother criticized everything Father did related to N.H. and pointed out that Mother had enrolled N.H. in counseling and did not advise Father. Davis indicated that N.H.'s counselor advised her that N.H. "had trouble adjusting between the homes; that he called his father Kurt, and that he did not disclose any concerns related to sexual abuse to her."
 {¶ 34} Davis explained that Father is a school teacher and that either he or his parents picked N.H. up from daycare at the end of each workday and transported him to any extracurricular activities. Davis stated that despite Mother's concerns, there was not any evidence that N.H. had not been properly supervised while with Father. Davis stated that Father encouraged a relationship between N.H. and Mother.
 {¶ 35} Regarding discipline, Davis testified that Father used a method called "one, two, three, magic," which consisted of a series of warnings before punishment. Mother indicated she did not discipline N.H. because he did not need it, stated Davis.
 {¶ 36} Regarding Mother's boyfriend, Davis testified that David Wolfe had "a record that included several domestic violence charges and assault and a couple other offenses."
 {¶ 37} Davis testified that although she believes N.H. loves both of his parents, it was her recommendation that Mother's visits with N.H. be supervised *Page 17 
in Ohio and in Florida. Davis acknowledged that because of the cost associated with supervised visitation and the distance between Mother and Father, her recommendation "does come with a lot of limitations to the time that [N.H.] would spend with his mom." Davis acknowledged Mother's financial limitations. Davis testified that she would also recommend that Father facilitate telephone communication between Mother and N.H. more often than twice per week for an appropriate length of time, although Davis recommended that Father monitor these calls to make sure Mother did not say anything harmful to N.H. Davis expressed concern about how the actual exchange of N.H. would be implemented after her recommendation went into effect. Davis also noted that under her plan, N.H.'s time with his stepbrother would be significantly decreased as N.H. would not be able to visit with his stepbrother unless J.H. went to supervised visitation with Mother. Davis stated that her recommendation did not contain a time frame because she saw "the need as indefinite, at this point in time, until something changes in regard to [Mother's] attitude and approach towards" Father. Davis acknowledged that her plan contained no way of measuring or determining Mother's progress that might affect her right to modify her visitation rights with N.H. because she saw "this situation as severe" and did "not hold a lot of hope for a change in the immediate future." Davis indicated that if Durr, after being made fully aware of the entire situation, felt comfortable that N.H. would not be subject *Page 18 
to the same sort of behavior by Mother in the future, Mother could move to modify her parental rights.
 {¶ 38} Davis described N.H.'s relationship with Mother as "too close." Davis stated that Mother is "over-nurturing" and "unable to let [N.H.] also have another relationship with his father." Davis also testified that N.H.'s daycare in Florida decided not to send any of N.H.'s drawings to Mother because N.H. was nervous about it and that the daycare had reported that N.H.'s demeanor changed after speaking to his mother by phone. Davis acknowledged that Mother had only called N.H. at daycare during the time that Father had cut off Mother's telephone communication with N.H. Davis stated that N.H. is a "completely different child" around Father than he is around Mother and that N.H. is "much more open and free to talk, lovingly and excitedly, about [Mother] and his home in Ohio * * * when he's with [Father] than he is able to talk about * * * Father or his home in Florida when he's with [Mother]." Davis acknowledged that she had no record of Mother making any critical or negative comments to N.H. or N.H. making any negative comments about Mother.
 {¶ 39} However, Davis would not agree that there was no evidence that Mother pressured N.H. She stated that N.H. constantly says things like, "my mom said that" or "I forgot what my mom told me about my dad. Why he's so bad. Why he's the devil." *Page 19 
 {¶ 40} According to Davis, her report stated: "`[Mother's] toxic animosity has already affected [N.H.] negatively and can be expected to further damage his development and emotional health absent appropriate intervention.'" Davis testified that "appropriate intervention" would be supervised visitation as the "prior agreement was devastating for [N.H.]." Davis' report was not contained in the record.
 {¶ 41} Mother testified that her family was "close-knitted" and "close-bonded" and was involved on a daily basis with N.H. and her other son J.H. Mother testified that when N.H. was with her, he attended Community Christian Preschool in Coventry for 3 hours per day, which is the same school J.H. attended. Mother stated that she and her sons attended church on a regular basis and that both sons played baseball. Mother testified that she has lived in her current home for six years and each of her sons has his own room. The house, Mother explained, has a finished basement which serves as the boys' playroom. Mother stated that the yard is fenced, there is a park across the street and her parents live two blocks away. Mother testified that if N.H. stayed in Ohio to attend school, he and J.H. would go to the same school, which would be beneficial because they are "best friends" and "inseparable." Mother stated that both boys verbally expressed their love for each other on a regular basis. Mother explained that when N.H. went to Florida, J.H. cried and wanted to sleep with N.H.'s blanket. Mother also *Page 20 
stated that N.H. got upset when he knew he had to leave for Florida. According to Mother, both boys have friends in the neighborhood.
 {¶ 42} Mother testified that she filed her motion to modify her parental rights because N.H. is now of school age and she wants him to attend the same school she attended and J.H. currently attends. Mother stated that she was the vice-president of the PTA and is very involved in the community and at school.
 {¶ 43} Mother denied that she would fail to facilitate any court-ordered visitation schedule and stated that she had never once failed to comply with any aspect of the shared parenting plan. Mother testified that if she were designated as N.H.'s residential parent, she would do whatever was necessary to facilitate a relationship between N.H. and Father, including agreeing to long visits during the summer, spring break, Christmas, etc. Mother testified that it would be better for N.H. to have consistency in his life and healthy eating habits, which he does not have in Florida. She further stated that it was Father that chose to move to Florida and that N.H. should not be punished for that. Mother further testified that Father initially refused to return N.H. to Ohio when she was hospitalized after her surgery, but her Dad convinced him otherwise. Mother also testified that Father had denied her telephone communication with N.H. for weeks. Mother admitted to calling N.H. at his preschool in Florida during a time period when Father had been denying her contact with N.H. Mother said she was worried because she had not spoken to N.H. and Father had previously told her, "he would take [N.H.] and *Page 21 
[she] would be very lucky to ever see him again." She reported all such incidents to Davis and/or Miller. Mother testified that she believes that N.H. should be able to pick up the phone when he is with either parent and call the other parent.
 {¶ 44} Mother stated that it was Davis who had reported the sexual abuse. She testified that Davis had reported the abuse after her 40 minute interview with N.H. Davis did not tell Mother she was going to call CSB and Mother reminded the court that she was not in the room when Davis interviewed N.H. Mother stated that an investigator from CSB came to her house thereafter and was pleased with what she saw.
 {¶ 45} Mother indicated that Miller's visit with N.H. was less than one hour despite the fact that N.H. wanted him to stay. N.H. also asked Miller to bring him home to Ohio when he came to visit him in Florida.
 {¶ 46} Mother testified that she had never been arrested and has never done drugs. She testified that her kids are her life. Mother indicated that her therapy with Durr has been helpful and that she plans to continue it.
 {¶ 47} Mother stated that she was aware that her boyfriend has been charged with domestic violence, but that it stemmed from a verbal argument with an ex-girlfriend in 1999, and did not involve any physical violence. Mother testified that she is employed at Wal-Mart, but is currently on medical leave after being involved in a serious motor vehicle collision. She testified that although David currently supports her and her sons, she planned to return to work part-time *Page 22 
the next month. Mother also stated that she would tell David to move out if the court so ordered because her kids come first.
 {¶ 48} On cross-examination, Mother denied telling N.H. that he should call Father, "Kurt." She said N.H. told her that he "doesn't want Kurt as his Dad" and that "Dave treats [him] better than [his] own dad does." Mother stated that Father had an ulterior motive in seeking custody of N.H. Father had previously told her that N.H. did not need a mother because he (Father) did not have one and turned out fine. Mother also testified that Father simply did not want to pay child support and that Father told her "he wants to see my dad begging for money on the street corner." Mother admitted that she had not yet paid Father $6,000 she owed him per the divorce decree. Mother denied telling N.H. to call Father the devil and believed that N.H. based his characterization on his personal experience with Father.
 {¶ 49} Father did not testify. Tener did not testify. Neither were the reports of any of the experts contained within the record. Thus, our review is limited solely to the testimony summarized above.
 {¶ 50} Upon review, we find that the trial court did not abuse its discretion in determining that it was in the best interest of N.H. (1) for Father to be named the residential parent, (2) for Mother to be allocated supervised visitation, and (3) for Mother's telephone communication with N.H. to be monitored. The trial court's decision carefully discusses the evidence and testimony presented, and *Page 23 
explains which testimony the court found more credible. The trial court's decision reflects that it considered the factors under R.C.3109.04(F)(2) in terminating the shared parenting plan. The decision also reflects careful consideration of the factors set forth under R.C.3109.04(F)(1) for reallocating parental rights, including N.H.'s interaction with his parents, N.H.'s adjustment to his home in Florida and his home in Ohio, Mother's mental health, and the parents' likelihood to honor and facilitate court-approved parenting time rights or visitation and companionship rights.
 {¶ 51} Although "[t]he wishes of the child's parents regarding the child's care" is a factor that courts can consider under R.C.3109.04(F)(1), the fact that Father did not testify is not dispositive of the determination of the allocation of parental rights and responsibilities. Contrary to Mother's assertion, there is no evidence that Father "refused" to testify at the hearing. The record reflects that he did not testify because he had a plane to catch. Mother has presented no evidence to refute this assertion. Furthermore, both Miller and Davis testified regarding their interactions with Father. In determining the best interest of a child under R.C. 3109.04(F)(1), the court has discretion in determining which factors are relevant. If no testimony is presented regarding a certain factor, then the trial court can determine that the factor is not relevant to its determination.
 {¶ 52} The trial judge, as trier of fact, is in the best position to weigh evidence and assess witness credibility. Seasons Coal Co. v.Cleveland (1984), *Page 24 10 Ohio St.3d 77, 80. This Court, therefore, cannot, and will not, substitute our judgment for that of the trier of fact. Id. Here, the trial court clearly considered all the testimony presented at the hearing. The trial court's decision reflects that the court felt very strongly about the negative impact Mother's hatred of Father has had on N.H. The trial court felt that Mother's actions towards Father "exemplify a complete disregard for [N.H.'s] well being." The court was largely influenced by Mother's actions in manipulating N.H. to falsely allege that his father has sexually abused him. The court was also persuaded by evidence that N.H. was a completely different child when in Florida with Father. Further, the court noted the guardian ad litem's testimony that N.H. spoke favorably about both parents while in Florida. The court concluded that because Mother continues to attempt to destroy Father's relationship with N.H., Father is more likely than Mother to facilitate parenting time.
 {¶ 53} While we recognize that the reallocation of parental rights and the supervised visitation and phone calls creates a harsh result for Mother, we are mindful that this plan is not necessarily permanent. Mother can file a motion for a change in the parenting time schedule after she successfully participates in intense psychotherapy with a proven treatment plan and demonstrates sustained favorable results.
 {¶ 54} Mother's assignments of error are overruled.
 III. *Page 25 {¶ 55} Mother's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Domestic Relations Division is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
 SLABY, J. DICKINSON, J. CONCUR. *Page 1