[Cite as *In re K.P.*, 2013-Ohio-5490.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | |

IN RE: K.P.
    M.P.

C.A. No.      13CA0001

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF WAYNE, OHIO
CASE Nos.    10-1025-CCV
                   10-1026-CCV

DECISION AND JOURNAL ENTRY

Dated: December 16, 2013

BELFANCE, Judge.

{¶1} Appellant Shane P. ("Father") appeals from the judgment of the Wayne County Court of Common Pleas, Juvenile Division. For the reasons set forth below, we affirm.

I.

{¶2} Father and Christiane C. ("Mother") had a 6 to 7 year relationship during which two children were born: K.P., born June 29, 2004, and M.P., born September 1, 2006. Around early 2009, the parties ended their relationship. Shortly thereafter, Father began living with his girlfriend, Stephanie P., whom he later married. Stephanie has a son, Zach, who is close in age to K.P, who also lives with Father and Stephanie. Also around the time the parties split up, Mother began living with her boyfriend Gerald Y. Mother has another, older daughter, Madison, who for a time lived with Father and Stephanie, but now resides with Mother and Gerald. While Father helped raise Madison, Father is not Madison's biological father.

**{¶3}** Initially, the parties had an informal parenting time arrangement, which was ultimately memorialized in a shared parenting plan journalized on September 13, 2010. The shared parenting plan provided that both parents would be residential parents of the two girls. The parties' interactions became more strained and contentious. According to Mother, Father began to deliberately withhold the children from her, and a pattern of deliberate alienation ensued. Much of the tension ensued from conduct related to Mother's interaction with Stephanie, who was alleged to have regularly insulted Mother by calling her by profane and derogatory names, some of which occurred in front of the children. Both Mother and Father filed motions in 2011 seeking to terminate the shared parenting plan and become the sole residential parent. Both parties and both girls underwent a psychological evaluation, and a guardian ad litem ("GAL") was appointed. A hearing was held before a magistrate, after which the magistrate found that it was in the children's best interest that Mother be named the sole residential parent. The trial court adopted the magistrate's decision, and later, Father filed objections to the magistrate's decision. Ultimately, the trial court overruled Father's objections.

**{¶4}** Father has appealed, raising a sole assignment of error for our review.

II.

ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED IN ITS FINDING THAT THE MAGISTRATE'S RECOMMENDATION, WHICH GRANTED APPELLEE'S REQUEST FOR A MODIFICATION OF THE PRIOR DECREE AND DESIGNATED APPELLEE THE RESIDENTIAL PARENT OF THE MINOR CHILDREN HEREIN.

**{¶5}** Father asserts in his sole assignment of error that the trial court erred in concluding that it was in the children's best interest for Mother to be named the sole residential parent. It does not appear that Father challenges the conclusion that it was in the best interest of the children to terminate the shared parenting plan. We will focus our analysis accordingly.

{¶6} Generally, "[w]hen reviewing an appeal from the trial court's ruling on objections to a magistrate's decision, this Court must determine whether the trial court abused its discretion in reaching its decision." *Daniels v. O'Dell*, 9th Dist. Summit No. 24873, 2010-Ohio-1341, ¶ 10. "In so doing, we consider the trial court's action with reference to the nature of the underlying matter." *Tabatabai v. Tabatabai*, 9th Dist. Medina No. 08CA0049-M, 2009-Ohio-3139, ¶ 18. "'[F]or a reviewing court to overturn a trial court's determination of custody, the appellate court must find that the trial court abused its discretion.'" *Kannan v. Kay,* 9th Dist. Summit No. 26022, 2012-Ohio-2478, ¶ 10, quoting *Masters v. Masters*, 69 Ohio St.3d 83, 85 (1994).

> A trial court may terminate a shared parenting plan "upon the request of one or both of the parents or whenever it determines that shared parenting is not in the best interest of the children." R.C. 3109.04(E)(2)(c). After the trial court terminates the prior shared parenting plan, the court shall "issue a modified decree for the allocation of parental rights and responsibilities for the care of the children * * * as if no decree for shared parenting had been granted and as if no request for shared parenting ever had been made." R.C. 3109.04(E)(2)(d). When allocating parental rights and responsibilities, the court must take into account the best interest of the children. R.C. 3109.04(B)(1). "To determine what is in the best interest of the child[ren] for the purpose of determining how to reallocate parental rights, the trial court must consider the factors set forth in R.C. 3109.04(F)(1)." *Hammond v. Harm*, 9th Dist. No. 23993, 2008-Ohio-2310, [] ¶ 11.

*Bentley v. Rojas,* 9th Dist. Lorain No. 10CA009776, 2010-Ohio-6243, ¶ 19; *see also* R.C. 2151.23(F)(1).

{¶7} R.C. 3109.04(F)(1) states:

> In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:
>
> (a) The wishes of the child's parents regarding the child's care;
>
> (b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶8}    The magistrate and trial court concluded that, based upon the testimony of the witnesses at the hearing and the recommendation of the GAL, it was in the best interest of the children that Mother be named the sole residential parent of K.P. and M.P.  It is clear from the totality of the record that both parents wanted custody of the children.  *See* R.C.

3109.04(F)(1)(a). There was also abundant testimony that would support the conclusion that both parents are good, loving parents who live in safe, adequate housing, and that both children got along with their step-siblings. Father's sister testified that the atmosphere in Mother's home is positive, stating that "it is a good atmosphere, there is no tension, it's relaxed, you know, a normal atmosphere with a mother and her children." *See* R.C. 3109.04(F)(1)(c). Mother did not complain about Father's parenting skills, but rather, the alienation that ensued subsequent to the commencement of his relationship with Stephanie. Additionally, it was certain that, irrespective of which parent received custody, both children would end up in a new school in the fall of 2012; Mother moved out of Wooster in February 2012, K.P.'s elementary school in Wooster was being closed and M.P. would just be starting elementary school. Thus, both children would face adjustment to a new school, no matter which parent was named residential parent. *See* R.C. 3109.04(F)(1)(d). While it is true that there was testimony that some of K.P.'s friends might end up at the same school if she stayed in Father's school district, it was unclear how important these friendships were to K.P. or that she would have trouble making new friends in a new school. Finally, the psychological evaluation revealed that the parties and K.P. and M.P. were functioning well and did not have mental health diagnoses. *See* R.C. 3109.04(F)(1)(e). However, the psychological evaluation of Father revealed that Dr. Bowden found his responses to a parenting assessment to be defensive and likely less honest than Mother's responses.

{¶9} While the psychologist recommended that shared parenting be continued and that the children alternate weeks at Mother's and Father's house, that recommendation was made prior to Mother moving out of the school district. The GAL opined that, given the distance between Mother's and Father's homes, the arrangement recommended by the psychologist was no longer feasible. Instead, the GAL recommended that Mother be named the sole residential

parent and that Father receive substantial parenting time. The GAL found that both parents were good and capable parents but concluded that, because Father and Stephanie had repeatedly disparaged Mother and because Father had denied Mother parenting time, Mother should be named the sole residential parent. In that regard, although Father denied that any parental alienation had occurred, the GAL did not find Father to be credible. She pointed out that, although both Father and Stephanie denied referring to Mother as a babysitter, the children themselves had been consistent that Mother is being called a babysitter.

{¶10} The GAL's concerns were supported by the testimony of several witnesses. Father's mother testified that, while she had never heard Mother or Gerald disparage Father, she had heard Father disparage Mother on at least two occasions since 2010. One of those occasions was on New Year's Eve when Mother had left the girls with Father's mother while she and Gerald went out. Father found out that the girls were there and came over and "started saying bad things" about Mother. Father's mother was not sure if the girls could hear what Father was saying about Mother. Father's mother also heard Stephanie yelling from the car, but did not know what she was saying. Mother testified that Father and Stephanie then showed up at the bar where Mother and Gerald were and Stephanie started yelling profanities at them.

{¶11} Father's mother thought it would be better for Mother to be the residential parent of K.P. and M.P. because the girls seem to act differently when they are around Father and Stephanie. Father's mother testified that the girls seem less inclined to acknowledge her or interact with her when they are with Father and Stephanie.

{¶12} Additionally, Mother's and Father's former neighbor, Angela Miller, testified. She indicated that she had heard Father calling Mother names and a bad mom in front of the girls a couple times. Ms. Miller also indicated that Stephanie had done the same on multiple

occasions. Ms. Miller stated that, in the presence of the girls, Stephanie would refer to Mother as "a whore, a * * * b*tch, a skank, the babysitter, and that [Mother] wasn't their mom, that Stephanie was their mom and just other different things like that." In January 2011, during a visitation transfer involving M.P., Stephanie also swore at Ms. Miller and threatened her. Ms. Miller admitted to swearing at Stephanie and coming out of the house and knocking on Stephanie's car window but denied that she started the argument or that she tried to open the car door. Ms. Miller maintained that all her actions were in response to behavior initiated by Stephanie. Ms. Miller acknowledged that Mother was also yelling at Stephanie and Father and could not say whether Mother was doing so in response or if Mother initiated the argument.

{¶13} Gerald testified that Mother used to attend many activities and functions at the children's schools but stopped doing so after there were numerous times she would encounter Father and Stephanie and they would scream at her. Gerald stated that Mother told him that "[she was] scared to go over there because there [wa]s going to be a fight." He also testified that at least on one occasion Father has talked badly about Mother in front of the girls and that Stephanie has spoken badly about Mother several times in front of K.P. and M.P. Gerald stated that Stephanie has repeatedly called Mother a "skank" and the "babysitter[.]" Gerald acknowledged that Mother would sometimes say things about Father and Stephanie but would do so in "code" or would do so under her breath so that the girls would not understand that she was speaking about Father and Stephanie.

{¶14} Mother testified that, while Stephanie's actions ultimately kept her from attending many school activities, she still attended the parent-teacher conferences. Mother stated that she stopped attending the other activities after Stephanie repeatedly called her names in front of the children and Mother noticed that that behavior started to have an effect on the girls. Stephanie

would call her the babysitter, a skank, trash, and a whore in front of the children. Mother testified that she asked Father to tell Stephanie to stop disparaging her in front of K.P. and M.P.; however, it appeared to Mother that Father took no action to attempt to remedy the situation. Mother indicated that, at one point, M.P. asked Mother if she "was the one that had her because Stephanie was telling her that she was in her belly and that [Mother] was just her babysitter." Mother acknowledged that the girls asked her if they could call Stephanie mom. Mother told them that was fine but further explained that Stephanie was their step-mother. Interactions became so strained between Mother and Stephanie that Mother filed a motion in the trial court requesting that Stephanie not be present at the transfers of the children.

{¶15} Stephanie denied much of the allegations that were made against her by the other witnesses. She testified that Ms. Miller and Mother were the ones that confronted her outside of Mother's home and denied yelling at either Mother or Ms. Miller. Essentially, Stephanie denied ever yelling and screaming at Mother and denied calling her names. She denied that she had ever referred to Mother as a babysitter and also denied that she told M.P. that she was her biological mother.

{¶16} Likewise, Father denied disparaging Mother in front of the children and denied allowing Stephanie to do so either. Father testified that Mother would call Stephanie names in front of the children and that Mother would comment that she was not the babysitter. Father indicated that he never heard Stephanie refer to Mother as the babysitter in Mother's presence but admitted that Stephanie had done so in conversations between Stephanie and himself.

{¶17} While Father asserts that his mother is biased against him, the GAL did not get that impression from his mother after speaking with her and felt that she was credible. The GAL expressed concern about the degree to which Father and Stephanie make disparaging comments

about Mother. She acknowledged that both Father and Mother have likely made inappropriate comments about the other but believed that Father and Stephanie do so much more frequently. The GAL in her report indicated that the girls have referred to Mother as "'the other mother'" and that Father and Stephanie have referred to Mother as the babysitter. There were also concerns raised by the GAL that the girls refer to Mother by her first name and call Stephanie, mom. Additionally, the GAL noted that, when Father reported to her that he believed Mother had hit K.P. in the school cafeteria,[1] the GAL was able to gather from the circumstances of the conversation that the children were in the car while Father was talking to the GAL. Thus, based on her interactions and experiences with all the parties and the children, the GAL testified that she found Father's and Stephanie's testimony hard to believe to the extent that they indicated that they never disparaged Mother in front of the children. The GAL also expressed concern that Father's responses on the parenting test conducted by the psychologist were defensive and that his denial of everyday parenting stresses suggested that he was not as honest in his responses as Mother.

{¶18} Moreover, there was testimony that, at times, Father had denied Mother parenting time with the girls. *See* R.C. 3109.04(F)(1)(f),(i). Mother testified that, on occasion, Father would call Mother and say that the children were just going to stay with him. Father denied withholding parenting time from Mother. Father explained that he and Stephanie would get the girls up early to go over to Mother's and the girls would end up wanting Father or Stephanie to

---

[1] The GAL spoke to school personnel about the allegations but no one witnessed Mother hitting K.P.; K.P.'s teacher stated that, if something like that had happened she would have expected the children would have been so shocked that they would have been talking about it during the day.

take them to school. So Father told Mother that, and Mother told them that was fine. Father testified that "[a]fter a while it got to be kind of a hassle to get them up earlier, so [he] just began to call [Mother] and * * * since she was letting them stay ninety percent of the time, [he] said [he] was going to take the girls to school." According to Father, Mother "could have called or whatever and sa[id] hey, you know, it's my time * * * but she didn't do so." The GAL testified after Father and indicated that she did not believe that Father was being truthful about denying Mother parenting time. The GAL averred that

> [W]hen [the GAL] was released as [GAL] in November until [she] was back in February when [she] met with [Mother] in her home * * * shortly after [Mother] had moved to Killbuck, there * * * must have been about twenty voice mail messages [from Father] * * * [and] there must have been about ten just of [Father] saying she's not coming [(referring to one of the children)], she's not coming, she's not coming. No she's sick, * * * we will make it up to you[,] nothing, * * * just blatantly, she's not coming and at that point [Mother] told me she couldn't even communicate back because her number was blocked from his phone so she just didn't pick her up.

{¶19} While there were certainly other concerns involving Mother present, such as suggestions from the girls and Father that Mother has a drinking problem and/or a party lifestyle and that Gerald grabbed K.P. by the collar, there were also similar concerns raised about Father, such as Father receiving a DUI during the pendency of this case. The GAL indicated in her report that it was unclear whether the girls were accurately portraying events or whether they were merely telling the respective parent things that they thought that parent wanted to hear. Notably, it appears that any concerns that were raised by either parent to children's services were unsubstantiated by the agency.

{¶20} In light of the entirety of the record, we cannot say that the trial court abused its discretion in concluding that it was in the best interest of K.P. and M.P. for Mother to be named the sole residential parent. While there was abundant evidence that Father and Stephanie were

very involved in the girls' lives and were involved in helping them succeed in school, there was substantial evidence that Father and, in particular, Stephanie engaged in a pattern of behavior that disparaged Mother and demeaned her role in the girls' lives. Father's and Stephanie's behavior could be characterized, based upon the record, as alienating the children from their Mother and bullying Mother into being less involved with her children. Mother indicated that the repeated screaming matches outside of the children's schools and the effects the same had on the girls caused her to refrain from attending various school functions. While Father seemed to view his actions of denying Mother parenting time as just acting according to the girls' wishes, there was evidence that undermined Father's testimony. The GAL testified that there was a time period when Mother could not even reach Father to demand her parenting time because he blocked her number and Mother had been prohibited for a time from going to Father's home. We are mindful that the magistrate observed all of the witnesses as they testified and that the court's credibility determinations played a central role in its decision. Given all of the evidence, the GAL's and trial court's concerns that the girls were being alienated from Mother were not unfounded. We cannot say that the trial court abused its discretion in naming Mother the sole residential parent. Father's sole assignment of error is overruled.

### III.

{¶21} In light of the foregoing, we affirm the judgment of the Wayne County Court of Common Pleas, Juvenile Division.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

EVE V. BELFANCE
FOR THE COURT

MOORE, P. J.
CARR, J.
CONCUR.

APPEARANCES:

ROSANNE K. SHRINER, Attorney at Law, for Appellant.

DAVID T. EAGER, Attorney at Law, for Appellee.