**[Cite as *Neckles v. Ruthrauff*, 2022-Ohio-3308.]**

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

KRISTYN NECKLES,                       :

    Plaintiff-Appellee,           :    CASE NO. 21CA12

    v.                            :

TERRY RUTHRAUFF,                       :    DECISION AND JUDGMENT ENTRY

    Defendant-Appellant.          :

_____

APPEARANCES:

Kyle C. Henderson, Logan, Ohio, for Appellant[1].

Gary Gottfried, Westerville, Ohio, for Appellee.

_____

CIVIL CASE FROM COMMON PLEAS COURT, DOMESTIC RELATIONS DIVISION
DATE JOURNALIZED:9-14-22
ABELE, J.

    **{¶1}** This is an appeal from an Athens County Common Pleas Court judgment that awarded custody of the parties' child to Kristyn Neckles, plaintiff below and appellee herein.  Terry Ruthrauff, defendant below and appellant herein, assigns two errors for review:

        FIRST ASSIGNMENT OF ERROR:

        "THE TRIAL COURT ERRED BY FAILING TO
        PROPERLY APPLY AND ANALYZE THE BEST INTEREST
        FACTORS ENUMERATED IN ORC 3109.04(A)IN

---

    [1] Different counsel represented appellant during portions of the trial court proceedings.

DESIGNATING PLAINTIFF AS LEGAL CUSTODIAN."

SECOND ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED BY ADMITTING AND
SUBSEQUENTLY PLACING GREAT WEIGHT UPON
INADMISSIBLE EVIDENCE PURSUANT TO THE OHIO
RULES OF EVIDENCE."

{¶2} Appellant and appellee are the biological parents of
H.R., born August 25, 2015 in Grenada, where the parties married
on February 14, 2015.  The parties divorced on March 14, 2017 in
Grenada, but the Grenada court made no provision for H.R.'s
custody.  On July 13 and 14, 2020, the trial court held a
hearing to consider the parties' separate requests for custody.

{¶3} At the hearing, appellee testified that she served as
H.R.'s primary caregiver while in Grenada.  Before the divorce,
appellee stated that appellant isolated himself, withdrew, and
had limited contact with H.R.  At the time of the divorce, M.M.,
appellee's older child born November 22, 2004, exhibited high
functioning autism, social anxiety, and dyscalculia, and lived
with appellant, appellee and H.R.  M.M.'s presence in the
household apparently created some difficulties in the
relationship.  For example, appellee testified that when M.M.
got marker on his sheets, appellant told M.M. "[i]f he couldn't
behave himself he would * * * not be able to live with us."  In
December 2016, M.M. left Grenada to live in Miami, Florida with

appellee's sister because he needed more support for his educational needs.

{¶4} In September 2017, appellee also left Grenada along with H.R. and her mother. Appellee left "emergently" because her sister could no longer care for M.M. in addition to her own children. Before appellee left Grenada, appellant had sporadic visits with H.R. and refused to acknowledge appellee's presence.

{¶5} In 2017, appellee obtained an H1B Visa to seek employment in the United States and took a position as a staff psychologist at Ohio University, her Visa sponsor. Appellee accepted the Ohio University offer over another offer in Washington state because of its proximity to Maryland, where appellant's family lives and where the parties previously discussed living if they moved to the United States.

{¶6} Before she arrived in Athens in September 2017, appellee visited her sister in Miami. While in Miami, appellee received a call from the Miami Shores Police that stated that appellant had inquired about H.R.'s well-being. Appellee told police she was in transit to Athens for employment and assumed they relayed this information to appellant. Also, the day she left Grenada appellee emailed appellant to advise him of her move and shared her cell phone number.

{¶7} A short time after moving to Athens, appellee filed a complaint for custody but the complaint was dismissed due to appellee's pending complaint in Grenada. Appellee also stated that during March, April, and May 2020, she offered appellant in-person and electronic visitation, but he refused. Appellee further testified that appellant did not contact H.R. or provide presents or cards on his birthday or any other holiday.

{¶8} Appellee testified that H.R. and M.M. have a "very close bond," doing chores, science experiments, collecting rocks, taking walks, and engaging together in other activities. H.R. is also very close with his Grenadian maternal grandmother and contacts her by phone. H.R. and M.M. are also close with their cousins, aunts, and uncles and see them regularly. Appellee and her boys attend cultural and other events at Ohio University to "build that sense of * * * love, to * * * foster that awareness that we are all different, * * * but we can coexist."

{¶9} Appellee stated that it is important to her, as a mother and psychologist, that H.R have a strong relationship with his father. Appellee described her relationship with appellant as "tense [and] hostile," and described appellant's passive-aggressive actions like zooming the camera in on H.R. during electronic calls so appellee could only see his eye or

the top of his head.  Appellee also described her difficulty communicating with appellant, stating that appellant would not look at her during drop-offs and refused to take H.R.'s belongings from appellee's hands, forcing her to set items on the ground before appellant would retrieve them.  Appellee also stated that appellant was financially controlling and asked her to "hand over [her] paycheck" more than once.

{¶10} Appellee testified that, although she did not have appellant's consent to leave Grenada with H.R., she did speak to him about her plan.  Appellee did concede that she did not consult appellant about testing H.R. into kindergarten early, but appellant did not ask the name of the teacher or school so that he could be involved.  Appellee further testified:

> Over the course of time, * * * you [appellant] have made it * * * virtually impossible to collaborate, and therefore you of your own behavior * * * have not connected with [H.R.], you won't talk to him [by] video, you won't talk to him on the phone, * * * you don't connect with him for his birthday, whether it's a birthday card, a phone call, Christmas, and that has all been you, so I do think your relationship is different, and it has impacted your bond.

{¶11} Appellee stated that her son often "cries for" her when he is with appellant and that he returned from his last visit with bruises and bites.  When asked on cross-examination what must happen for appellant to have the bond that appellee

has with H.R., appellee replied, "[f]or you to stop putting your needs and ego first and consider H.R."

{¶12} Kendra Brooks, H.R.'s daycare teacher and babysitter, has known H.R. and appellee for approximately two years. Brooks stated that H.R. and M.M. have a great relationship and that H.R. "talks about his Mother all the time, about how much he loves her, bigger than the ocean, and um he's just very sweet, very kind." Brooks described appellee as a "very present Mother * * * "the toys that she brings in, the foods that she brings in, everything is very intentional, she wants her kids to grow educationally, she wants them to grow * * * to be good citizens." Michelle Monrose, appellee's former mother-in-law, testified that M.M. is the son of appellee and Monrose's son, Shervon. Monrose and her son live in Saint Lucia, but Monrose frequently talks to M.M. and has "never been kept away from [M.M.]." She further testified that appellee has always facilitated their relationship. Monrose described appellee as "a wonderful parent, very, very very good parent, in spite of [M.M.]'s um condition she has, she's doing an excellent job with [M.M.]. I have no complaints when it comes to [appellee] taking care of M.M."

{¶13} Ohio University Child Development Center Master Teacher Matthew Johnson testified that he worked with H.R. for

approximately two years. The Center is racially and culturally diverse, with children from many countries. Johnson testified that H.R has excellent "verbal acuity," is well adjusted, "pretty tight" with his friend group, and enjoys nature walks. H.R. often talks about [M.M.], and Johnson stated that appellee takes "really good care" of H.R.

{¶14} Howard Pinnock, Acting Director of Public Prosecution in Saint George's, Grenada, testified that an attorney contacted him on appellant's behalf and inquired whether a mother leaving Grenada with a child would be a criminal matter, but Pinnock advised that his office is not an investigative body and, instead, suggested that the attorney report the matter to police. Pinnock later spoke with a detective and learned that no investigation or criminal charges arose out of the matter.

{¶15} Athens Middle School Intervention Specialist Julie Mollica testified she has been M.M.'s teacher for two years, that M.M. has a good relationship with H.R., and appellee has been "very involved, * * * always asking questions, wanting to know how he's doing, always comes to conferences."

{¶16} Patton College of Education Stevens Literacy Center Director Julie Francis testified that she worked with H.R. and M.M. in their after-school reading club, and that H.R. is a "very happy child, and he spreads his joy. * * * [H.R.] is one

of those kids that * * * learning for him is just second nature, cause he's always thinking, he's always talking, he's always exploring." Francis described appellee's family as an "important engaged family."

{¶17} Guardian Ad Litem Sonya Marshall testified that she spoke with both parties during her investigation and reviewed the pleadings and documents. Marshall visited appellee at her home, but due to the COVID-19 pandemic conducted a Skype home visit with appellant. Marshall stated that the most significant challenge is "they struggle to communicate and co-parent together * * * for [H.R.]." Both parties have good intentions and "want to act in [H.R.]'s best interest." Marshall believed that both residences are safe and stable, and neither has mental health or substance abuse issues.

{¶18} After she concluded her investigation, Guardian Ad Litem Marshall recommended the court designate appellee H.R.'s residential parent and legal custodian, that H.R. reside primarily in Ohio with appellee, and appellant have parenting time with H.R. Marshall did not recommend shared parenting due to the distance between the parties, and further noted that, if appellant became H.R.'s residential parent would be "a drastic shift in H.R.'s * * * world," and "it would be really difficult for [H.R.] to adjust to that." Marshall also recommended that

the court hold H.R.'s passport so neither party could take him out of the country without the other party's consent. Marshall did acknowledge on cross-examination that when appellee removed H.R. from Grenada, it was "like a stick of dynamite" to the couple's divorce proceedings.

{¶19} Appellant testified that appellee kept his son from him for 777 days, from September 18, 2017 to November 2, 2019, and further accused appellee of the violation of "repeated rulings by Ohio courts," and the Hague Convention. Appellant stated that appellee has been "quite aggressive on three or four occasions," that appellant is afraid of appellee and feels vulnerable to possible accusations due to his federal employment. Appellant testified:

> Plaintiff's Ohio scheme is not working and not in [H.R.]'s best interest. * * * Plaintiff's behavior is damaging to my son, and I must protect and position him to achieve at his optimal for this precarious human life. * * * The Plaintiff has willfully and repeatedly blocked my access to my son, pre-birth to the present day. * * * [T]his has been a brutal weaponization of a little boy for whatever reason we cannot explain, but it's resulted in the most heartbreakingly painful period of my entire life by far.

As for keeping in touch with H.R. electronically, appellant stated:

> About electronic interaction and phone interaction, it's qualitatively and quantitatively remarkably different, it just doesn't work for me, that's not the kind of Father I wanna be. * * * Why don't I phone and video

conference with [H.R.], it's heart wrenchingly painful to see a little boy that I desperately love so cut off from me, I do not value electronic interaction, I simply don't. I want direct daily, in the same physical space contact. I'm a humanist, and that's what we value, you know I am not gonna settle for the crumbs of parenthood.

{¶20} Appellant testified that on October 22, 2017 he first became aware of appellee's and H.R.'s Athens residence, but acknowledged that at that time that he did not seek custody or visitation. Appellant's employment with Saint George's University in Grenada ended July 31, 2018, and he left Grenada on August 1, 2018 without employment secured in the United States.

{¶21} Appellant maintained that appellee could "very easily transition to Shepardstown [West Virginia] or in that area" near appellant's family. When the magistrate asked whether appellant could have moved to Athens when he relocated to the United States, he replied, "No," citing his family and higher income where he lives. Appellant stated, "I want [H.R.] to experience * * * the richness of both sides of the family, both extended sides of the family, everyone, this is all about inclusivity, this is not about excluding anyone." Appellant did acknowledge, however, that appellee could not move from Ohio to Shepardstown without securing an H1B Visa sponsorship in a new location.

{¶22} Appellant also stated his belief that child support is

"incredibly unfair" to him, and he does not understand why he pays child support when he cannot see his son. Appellant complained that the total amount of support he would pay until his son reaches the age of majority is over $300,000, and it would "cripple my ability to provide for my son and frankly because I'm part of this relationship too, it will cripple my ability to care for myself * * *." Appellant acknowledged his $133,465 salary, but stated that he will be 60 on his next birthday and "I do not have many work years left." Appellant also admitted he did not attend a required Parenting Seminar, but said he did not know about the seminar. Appellant did also acknowledge that he had been in the Athens area since the Saturday prior to the hearing, but declined an opportunity to Skype with H.R.

{¶23} Rebecca Gorra testified that she has known appellant for 35 years, is a former colleague and described appellant as financially responsible, "extraordinary, unique, one of a kind," and "a wonderful father." Ms. Gorra acknowledged that she once had a relationship with appellant, that she had seen appellant interact with H.R. for only three days, and that appellant's failure to pay child support until very recently is understandable "under these circumstances."

{¶24} John Gorra, Jr., Rebecca's husband, first met

appellant in 1997.  Appellant has stayed in the Gorras' home many times and they know each other well.  Although Mr. Gorra observed appellant interact with H.R. for only a few hours, he said appellant has had very positive interactions with the Gorras' children over the years.

{¶25} Alexandra Groody testified that she met appellant in 1998 at the Antioch University Clinical Psychology Program.  Groody also visited appellant and appellee in Grenada when H.R. was born, and planned to visit H.R. with appellant in Athens, but appellee canceled the visit.  Groody described appellant as peaceful, organized, disciplined, generous, and fair, and that his separation from H.R. has ruined appellant's life, "been disastrous, * * * horrible, * * * heartbreaking * * * bewildering."

{¶26} Jewel Ann Ruthrauff Grossnickle, appellant's sister, has a close relationship with appellant.  She has observed appellant care for his son, described H.R. as very happy, and does not understand why appellant does not have custody of H.R. Ms. Grossnickle also expressed admiration for her brother and noted that appellant even forgave the man who murdered their mother.  On cross-examination, Ms. Grossnickle acknowledged that, although she had appellee's email address, she did not reach out to appellee to schedule a visit.

{¶27} Kevin Grossnickle, appellant's brother-in-law, has known appellant since 2014 and recently spent time with H.R. when he visited appellant in June and July 2020. He believes H.R. should be in appellant's care. Mr. Grossnickle did not think H.R. should be in appellee's care because she called his wife and made her cry, then he had to contact appellee to ask her to stop calling.

{¶28} Bennett Shouse has known appellant since 1995 when they met in the Peace Corps. Shouse also traveled to Athens with appellant in November 2019 when appellant visited H.R. for three hours at the library. Shouse testified that appellant should be the residential parent because appellee is "vindictive." Shouse conceded, however, that he has not seen or spoken with appellee since the parties' divorce, and he did not know appellant canceled visits with H.R. for March, April, and May 2020, and did not financially support H.R. until the court ordered support. Shouse also did not know that appellee offered appellant the opportunity to video chat or Skype, but appellant declined.

{¶29} Lauri Ricker has known appellant for 30 years and was a colleague for four years. Ms. Ricker observed appellant interact with H.R. once during a two or three-hour visit at appellant's home and described appellant as an honest and decent

person.  She agreed that a responsible parent communicates with his or her child, acknowledges a child's birthday, and is financially supportive.  Patrick Ricker, Lauri's husband, has known appellant since 1990 when they worked together.  Mr. Ricker testified that appellant is caring, inquisitive, honest and, with a large circle of friends.  Mr. Ricker did not know why appellant should not be H.R.'s residential parent.

{¶30} Hugo Hoffman has known appellant for 25 years after they met in the Peace Corps.  Hoffman also accompanied appellant in Athens when they visited with H.R. at the library for three hours.  Hoffman did not know any reason why appellant should not be the child's residential parent, and said that H.R.'s absence has been detrimental to appellant's health and emotional well-being.

{¶31} On November 24, 2020, after reviewing the evidence and considering counsels' arguments, the magistrate recommended a custody award to appellee and parenting time to appellant. After both parties objected to the magistrate's decision, the trial court directed the magistrate to supplement her November 24, 2020 decision to address travel arrangements for defendant's monthly visitation and tax credit or dependency benefits. Subsequently, the magistrate issued a supplemental written recommendation and the trial court overruled the parties'

objections, adopted the magistrate's decision and entered final judgment. This appeal followed.

I.

**{¶32}** In his first assignment of error, appellant asserts that the trial court failed to properly analyze and apply the R.C. 3109.04(A) best interest factors when it designated appellee the custodian of H.R.

**{¶33}** At the outset, we recognize that the case sub judice involves a contentious relationship between appellant and appellee, H.R.'s biological parents, who both appear to genuinely love and care about their minor child's well-being. After the trial court heard the evidence and the guardian ad litem's recommendation, the court attempted to decide the difficult issue of parental custodial rights, with H.R.'s best interest as the court's paramount consideration. We also recognize and emphasize that decisions in child custody matters are among "the most difficult and agonizing decisions a trial judge must make." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). Again, this is especially true in situations when two loving, caring parents are sincere in their effort to act in their child's best interest. Therefore, trial judges must have wide latitude in considering all the evidence and such decision must not be reversed absent an abuse of

discretion. *Id.*, citing *Miller v. Miller,* 37 Ohio St.3d 71, 523

N.E.2d 846 (1988). The Supreme Court of Ohio has explained:

> The reason for this standard of review is that the trial judge has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page.
>
> * * *
>
> This is even more crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well.
>
> *Davis,* 77 Ohio St.3d 415, at 418-419.

**{¶34}** To determine if a court has abused its discretion, an

appellate court must examine the facts and applicable law and

determine whether the trial court's decision is unreasonable,

arbitrary or unconscionable. *Blakemore v. Blakemore,* 5 Ohio

St.3d 217, 450 N.E.2d 1140 (1983). Thus, when a substantial

amount of credible and competent evidence supports a custody

award, a reviewing court will not reverse that determination.

*Bechtol v. Bechtol,* 49 Ohio St.3d 21, 550 N.E.2d 178 (1990),

syllabus.

In determining the allocation of parental rights and responsibilities, courts must consider a child's best interest. R.C. 3109.04(B)(1); *In the Matter of J.S.*, 4th Dist. Meigs No. 18CA24, 2019-Ohio-4959, ¶ 12, *In the Matter of A.B.*, 2019-Ohio-90, 128 N.E.3d 694, ¶ 39 (4th Dist.). R.C. 3109.04(F)(1) provides the framework for analysis and states that to determine a child's best interest, a court must "consider all relevant factors, including, but not limited to," the following:

(a) The wishes of the child's parents regarding the child's

care;

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the

commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

**{¶35}** Appellant contends that, although the magistrate's decision generally considered the R.C. 3109.04(F)(1) factors, the trial court erroneously applied those factors to award appellee legal custody. In particular, appellant argues that the court failed to apply significant factors of subsections (f), (i), and (j), despite "substantial evidentiary testimony."

**{¶36}** Once again, we emphasize that in general, and especially in contested child custody maters, a trial court is in the best position to weigh evidence. *Hammond v. Harm*, 9th Dist. Summit No. 23993, 2008-Ohio-2310, ¶ 51; *Blausey v. Blausey*, 6th Dist. Ottawa No. OT-18-039, 2019-Ohio-4506, ¶ 14. Further, a trial court has discretion to determine which factors are relevant, and each factor may not necessarily carry the same weight or have the same relevance, depending on the facts before

the trial court. *Krill v. Krill,* 3d Dist. Defiance No. 4-13-15, 2014-Ohio-2577, ¶ 29, citing *Brammer v. Brammer,* 3d Dist. Marion No. 9-12-57, 2013-Ohio-2843, ¶ 41; *Hammond* at ¶ 51. After our review in the case sub judice, we believe that appellant's argument that the trial court failed to properly analyze the R.C. 3109.04(A) best interest factors is without merit.

{¶37} In its decision, the trial court noted that the parties separated when H.R. was one-year old. Appellee then initiated a divorce and the parties participated in mediation and agreed to a parenting schedule for December 27, 2016 to January 31, 2017. Later, appellant stated that he was "deeply opposed" to a mediation agreement and signed it "under duress." On April 7, 2017, appellee initiated custody proceedings in Grenada.

{¶38} The trial court observed that on September 29, 2017, appellee left Grenada with H.R. and came to the United States. The court noted that throughout the pendency of the case, appellant alleged that appellee "kidnapped" or "abducted" H.R. and/or "left Grenada with [H.R.] without Defendant's consent, and in breach of the mediation agreement." The court determined, however, that the mediation agreement did not prohibit appellee from traveling with H.R. and her other son, and actually implied she is the custodial parent as the

mediation agreement set forth a parenting schedule for appellant and required appellant to retrieve H.R. from appellee.

{¶39} The trial court also referred to a May 7, 2017 email from appellant to appellee in which appellant wrote, "When people find my decapitated, headless, shot through, overdosed, bled out, drowned and crumpled carcass washed up on a beach somewhere, please feel free to take the blame." Further, in a May 8, 2017 email, appellant wrote to appellee, "Does your father have a handgun? If so, could I borrow it for just a second? I would not make such a request again, as I would only need it once." The court described multiple instances of appellant rebuffing appellee's offers to visit their son and referred to appellant's 96-page pretrial hearing affidavit, which, inter alia, states:

> Who else on this planet besides the plaintiff would think my email messages of May 7 and 8, 2017, conveyed blame and suicidal intent and try to use it against me? Her misinterpretation clearly illustrates how she psychopathologizes my way of being in the world, reaches erroneous conclusions about me and then acts on them, which includes moving my son around the planet without my knowledge or consent. If she really thought I was suicidal, why did she later do exactly what supposedly put me into that state and separate me from [H.R.]?

{¶40} The trial court also pointed out that, although appellant's pretrial hearing affidavit denies that he refused to spend time with H.R. from August 1 to 25, 2018, appellant's own

email indicates that he would "NEVER come to Athens" and he felt reaching a temporary agreement "too risky" for him. The court also referenced other examples when appellant claimed he wished to visit his son, but refused offers to do so. The court further observed that appellant does not send birthday or holiday cards or presents and "has chosen not to have any contact with [H.R.] outside of his parenting time."

{¶41} Regarding the trial court's legal analysis and conclusions of law, the trial court cited R.C. 3109.04(A) and reviewed the R.C. 3109.04(F)(1) best interest factors. Concerning (F)(1)(a), the wishes of the parents, the court observed that both parties sought sole custody. Regarding (F)(1)(b), wishes of the child, the court noted that neither party requested an in camera interview. Concerning (F)(1)(c), the child's interaction and interrelationship with the child's parents, siblings and other persons, the court noted that:

> [H.R.] seems to be a special child. Everyone who comes into contact with him, loves him. He radiates joy and happiness. He loves both parents but is closer to his mom than his dad. To some extent this is due to Plaintiff's actions, specifically, the nature of Plaintiff's departure from Grenada, setting up home here, and the resulting lack of contact between Defendant and [H.R.], but it's not all due to that. * * *
>
> Defendant, through his own actions and inactions, has contributed to this difference in [H.R.]'s respective relationships with his parents. Defendant has

absolutely refused to take advantage of technology and to video-chat and/or Skype with [H.R.]  And he hasn't refused to do so out of any concern for [H.R.], but rather because it's not the relationship he wants.  He sees no value in it - no value in telling his little boy good night, or reading him a bedtime story, or just seeing how he's doing, or hearing what they each did that day - when he's unable to be with him.  It may be of no value to Defendant; but it's priceless to a child. For the months of March, April, and May, 2020, Defendant canceled his visits due to COVID, which the Magistrate does not fault him for, but he had NO contact with [H.R.] during those months and that was entirely his choice.

So, while Plaintiff is not innocent in creating this situation; neither is Defendant.

[H.R.] is very close to his big brother, [M.M.], Plaintiff's older son who resides with them in Athens.

Defendant has family and friends that reside in the Shepherdstown area and these individuals would, no doubt, provide a family structure for [H.R.] and family support.  It's interesting that Defendant's family described it as 'heart wrenching' to have not been able to see [H.R.], yet none of them ever contacted her to ask about seeing [H.R.].  Defendant's friends testified as to Plaintiff's 'bad behavior' and keeping [H.R.] from Defendant, yet none were aware of Defendant's canceled visits, of Defendant declining Plaintiff's offers of additional parenting time, of Defendant's absolute refusal to video-chat with [H.R.], or of Defendant's own 'neglect' in not observing his son's birthday.

{¶42} Appellant argues that the trial court (1) minimized "the unnoticed move to another country of Mother and the impact that has had on the relationship between Father and Child," and (2) placed "significant emphasis on the position of Father to not seek video or telephone contact."  We believe, however, that

the trial court spent considerable time analyzing and applying this factor. The fact that appellant may disagree with the outcome is inconsequential, as appellant does not point to anything in the record to indicate that the court acted unreasonably, arbitrarily or unconscionably. Regarding (F)(1)(d), the adjustment to the child's home, school, and community, the trial court found that H.R. is well-adjusted to life in Athens, has friends, and enjoys daycare. The court recognized that appellant chose to seek employment away from Athens to earn greater income and be close to his family, rather than proximity to his son. Appellant, however, contends that appellee's presence in Athens is temporary and her work Visa expires in August 2022, while appellant is a West Virginia permanent resident. However, as the trial court observed (1) Ohio University extended appellee's H1B Visa for three years, effective August 27, 2019, and (2) the Visa is not transferrable to another employer without starting the application process anew. Once again, appellant may disagree with the outcome, but fails to establish an abuse of discretion.

{¶43} Regarding (F)(1)(e), the mental and physical health of all persons, the trial court remarked that appellant appears to be a prisoner of the past, while appellee does not. The court read every communication between the parties and found appellee

to be "polite and courteous," while appellant "derogatory and dismissive, and even insulting." For example, the court noted a comment from one of appellant's communications, "If you are confused about the order, perhaps it would be useful for you to consult with your buddy, Attila the Attack Attorney. Junior or Senior. Oh wait, I am not entirely convinced that Junior can read." We, recognize, however, that it is not uncommon for the disintegration of a marriage to be extremely tumultuous and minor indiscretions should not be accorded great weight.

{¶44} Concerning (F)(1)(f), the parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights, the trial court found both parties equally likely to honor court orders. However, appellant points out that appellee had been found in contempt for denial of holiday parenting time. Although appellant is correct about appellee's interference with appellant's Christmas 2019 parenting time, and established as a purge condition that appellant have parenting time Christmas 2020, the trial court considered this incident to be "a unilateral mistake" and "misunderstanding." Moreover, even if we consider, for purposes of argument, that the trial court erred in applying this particular factor, we believe that ample competent, credible evidence supports the R.C. 3109.04(F) determination.

**{¶45}** Regarding (F)(1)(g), whether either parent has failed to make all child support payments, and (F)(1)(h), criminal offenses, the trial court noted that neither party raised these particular issues.

**{¶46}** Regarding (F)(1)(i), whether the residential parent, or one parent subject to a shared parenting decree, has continuously and willfully denied the other parent's right to parenting time pursuant to a court order, the trial court did not consider evidence as to this factor. Although appellant argues that the trial court should consider the contempt finding and appellee's relocation that occurred during the Grenada court proceeding to be a willful denial of parenting time, the trial court pointed out that no court order prevented appellee from leaving Grenada with H.R.

**{¶47}** Finally, regarding (F)(1)(j), whether either parent has established a residence, or is planning to establish a residence, outside this state, the trial court noted that neither party raised this issue. Although R.C. 3109.04(F)(1)(j) requires a court to consider whether a parent has established a residence outside of Ohio, generally "nonresidence alone should not deprive a parent of custody." *Ornelas v. Ornelas*, 2012-Ohio-4106, 978 N.E.2d 946, ¶ 13, citing *Marshall v. Marshall*, 117 Ohio App.3d 182, 187, 690 N.E.2d 68 (3d Dist.1997).

Appellant, however, asserts that this is the most significant factor, in view of the fact that appellee is a resident of Grenada and living in the U.S. on a temporary work visa. The court found:

> Plaintiff's employment offer from Ohio University was conditional upon obtaining a non-immigrant work Visa (H1B Visa). To do so, requires a sponsor and Ohio University was Plaintiff's sponsor. This Visa was not transferrable to another employer; rather, a new employer would need to complete a new Petition for a Nonimmigrant Worker and have it approved in order to Plaintiff to remain in the United States on an H1B Visa. * * * Plaintiff's H1B Visa was extended for three (3) years effective August 27, 2019, again, sponsored by her employer, Ohio University.

Further, the court ordered H.R.'s passport deposited with the Athens County Clerk of Court and that:

> either party desiring to travel internationally with [H.R.} shall need to petition the Court to do so, thereby giving notice to the other party of the request. The Court shall schedule a hearing on the matter and will not order release of the passport without a hearing.

{¶48} Consequently, although appellee is a Grenadian citizen and moved to Athens County, we find nothing in the record to suggest that appellee plans to relocate outside Ohio, or that the trial court's judgment does not address international travel. Once again, we believe that competent, credible evidence supports the trial court's R.C. 3109.04(F)

determination.

**{¶49}** It is also important to again emphasize that when a court makes a child custody determination, the child's best interest is the primary consideration, not the parents' best interests. In the case sub judice, although the distance between the parties does create a challenge to formulate a reasonable parenting plan, before fashioning the custody order the trial court thoroughly reviewed the R.C. 3109.04 factors in a comprehensive judgment entry and concluded it is in H.R.'s best interest to designate appellee the residential parent and legal custodian and award appellant parenting time.

**{¶50}** Therefore, after our review of the record in the case at bar, we conclude that the evidence adduced at the hearing supports the trial court's designation of appellee as the child's residential parent. Thus, we do not believe that the court's judgment constitutes an abuse of discretion.

**{¶51}** Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.

                                    II.

**{¶52}** In his second assignment of error, appellant asserts that the trial court erred by admitting and placing great weight on certain inadmissible evidence, including various out-of-court

statements.

**{¶53}** First, appellant argues that the trial court relied upon an out-of-court statement contained in an October 7, 2019 letter from Higher Marks Educational Centre, Grenada, that states that the Centre could not meet the needs of M.M. and "there is no school on the island with a specialized program that could deal effectively with [M.M.]'s academic challenges in a way that would help him to self-actualize." Appellant contends that this letter was not subject to cross-examination and constitutes hearsay.

**{¶54}** " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Generally, hearsay is inadmissible unless the statement falls under a hearsay exception. Evid.R. 802. "Ordinarily, we review a trial court's hearsay rulings for an abuse of discretion." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 97, citing *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967). However, because in the case sub judice appellant did not object to the admission of these items, we must review for plain error. *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 72, citing *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d

927, ¶ 66.  Generally, courts recognize plain error " 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' "  *State v. Landrum*, 53 Ohio St.3d 107, 111, 559 N.E.2d 710 (1990), quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.  For plain error to apply, a trial court must have deviated from a legal rule, the error must have been an obvious defect in the proceeding, and the error must have affected a substantial right.  *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).  Under the plain error standard, appellant must demonstrate that the outcome of the proceedings would clearly have been different but for the trial court's errors. *State v. Waddell*, 75 Ohio St.3d 163, 166, 661 N.E.2d 1043 (1996), citing *State v. Moreland*, 50 Ohio St.3d 58, 552 N.E.2d 894 (1990).

{¶55} Although the Centre letter is an out-of-court statement, we do not believe the proponent offered the statement to prove the truth of the matter asserted.  As appellee notes, appellee offered the letter to provide context for her departure from Grenada.  The magistrate referred to the letter in reference to appellant's denial that a program in Grenada could not meet appellee's son's needs.  Moreover, appellant did not object to the letter's admission.  Here, we cannot conclude that

the outcome of the proceedings would have been different but for the letter's admission.

**{¶56}** Second, appellant contends that an affidavit from Brendon La Touche, Crown Counsel in the Office of the Director of Public Prosecutions, also constitutes hearsay. The magistrate's decision observes: "Defendant has stated, attested to, and testified that Plaintiff was the subject of a criminal investigation and charges in Grenada for abduction of [H.R.]." Further, the court noted that appellant's September 13, 2019 affidavit stated:

> On January 24, 2018, when it finally became evident to me that Plaintiff had no intention of returning to Grenada, or allowing me to visit with [H.R.] in Ohio, I pressed criminal charges through Grenada's Criminal Investigation Department of the Royal Grenadian Police Force against Plaintiff for abducting [H.R.] and evading my parental custody.

The magistrate pointed out that the La Touche affidavit "denies such and states that there are/were no such charges or investigations and that Defendant made no such report on January 24, 2018 as he claims." Also, like the Centre letter, appellant did not object to this affidavit. Once again, under the plain error standard of review, we cannot conclude that the outcome of the proceedings would have been different but for the admission of the affidavit.

{¶57} Finally, appellant asserts that appellee's testimony regarding an out-of-court statement of an unknown Miami Shores Police Department employee regarding H.R.'s location constitutes hearsay. At the hearing, appellee testified that she flew to Miami in late September 2017, then in early October 2017 arrived in Athens to start employment. Appellee stated that, while in Florida, a member of the Miami Shores Police Department called her for a well-check for H.R. that appellant had requested. Appellee testified that she told the police she was in transit to Athens to start a new job and "was advised that MSPD communicated this" to appellant. Appellant argues that the trial court placed significance on this statement and then shifted the burden to appellant regarding why, at that point, he did not relocate to Athens.

{¶58} However, as with the other matters mentioned above, appellant did not object to appellee's testimony regarding her phone conversation with the police. Under the plain error standard of review, we cannot conclude that the outcome of the proceedings would have been different but for the admission of this testimony. In view of the scope of the issues and evidence adduced at the hearing, we do not believe that these alleged hearsay matters are not of sufficient importance to impact the trial court's decision.

{¶59} Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and appellee recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

ATHENS, 21CA12

It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Hess, J.: Concur in Judgment & Opinion

For the Court

BY:_____
                                    Peter B. Abele, Judge


NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.