[Cite as *J.T. v. L.H.*, 2024-Ohio-4615.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

J.T.                                                    Court of Appeals No.  E-23-055

     Appellant                                    Trial Court No.  2022 JB 0016

v.

L.H.                                                   **DECISION AND JUDGMENT**

     Appellee                                     Decided:  September 20, 2024

* * * * *

Gina M. McNea, for appellant.

Shelly L. Kennedy, for appellee.

* * * * *

**DUHART, J.**

**{¶ 1}** This is an appeal by appellant, Joshua Tucker ("father"), from the October 31, 2023 judgment of the Erie County Court of Common Pleas, Juvenile Division, which granted appellee, Lisa Hauck ("mother"), custody of their child.  For the reasons that follow, we affirm the judgment.

**{¶ 2}** Father sets forth one assignment of error:

The Trial Court abused it's [sic] discretion when it made

conclusions that are unreasonable, arbitrary and unconscionable,

that are not based upon the evidence and testimony adduced at Trial and improperly weights [sic] O.R.C. 3109.04 (F)(1), best interest factors.

## Background

{¶ 3} In 2012, mother and father were in an on-again, off-again relationship, when in December, mother gave birth to child, A.T. Mother and father were not married and did not live together, but paternity of the child was not disputed. The parents had not legally established their parental rights and responsibilities for the child, but the parents lived near each other and worked together to raise their child for a long period of time. By operation of law,[1] mother was the child's residential parent and legal custodian.

**Child Support**

{¶ 4} In February 2014, a child support order was issued by the Erie County Child Support Enforcement Agency ("CSEA"), establishing father as obligor and mother as obligee. Father was ordered to pay $249.63 per month for child support, plus a processing fee ("fee"). Then, in January 2015, father was ordered to pay, when private health insurance was provided for the child, $332.05 per month for current child support, plus a fee, and when private health insurance was not provided, $249.63 per month for current support, plus a fee. Father was also ordered to pay $66.41 monthly on arrears, plus a fee.

---

[1] R.C. 3109.042(A) ("An unmarried female who gives birth to a child is the sole residential parent and legal custodian of the child until a court . . . issues an order designating another person as the residential parent and legal custodian.").

2.

{¶ 5} In July 2015, CSEA filed a motion to show cause asking that father appear and show cause why he should not be punished for failing to make child support payments. In October 2015, father was found in contempt of court for failing to pay support and was sentenced to 30 days in jail, which sentence was stayed, with purge conditions set. In June 2017, CSEA filed a motion for imposition of sentence, requesting that father's jail sentence be imposed. In October 2017, father was ordered to report to jail to serve 10 days in full satisfaction of the 30 days previously ordered.

{¶ 6} In July 2022, mother filed a motion to show cause requesting father appear and show cause why he should not be held in contempt for failing to pay child support.

{¶ 7} In February 2023, a trial was held on, inter alia, the child support matter.

{¶ 8} In April 2023, the magistrate issued a decision in which he found that father was in contempt for failing to pay child support. The magistrate recommended that father be sentenced to 60 days in jail and pay a fine and court costs, but the magistrate proposed that father be allowed to purge himself of the contempt upon meeting certain conditions.

{¶ 9} On October 31, 2023, the juvenile court found father in contempt for failing to pay child support. The court sentenced father to 60 days in jail, the usual sentence for a second contempt finding per R.C. 2705.05(A)(2) and ordered father to pay a fine and court costs. Father did not appeal the child support issue.

3.

**Parental Rights and Responsibilities**

{¶ 10} In February 2022, father filed a Complaint for Parentage, Allocation of Parental Rights and Responsibilities (Custody), seeking custody of the child.

{¶ 11} In February 2023, a trial was held on, inter alia, father's complaint, as mother wanted to keep custody of the child. Testimony from father, mother, the principal at the child's school, and father's sister was presented, 29 exhibits were offered into evidence and 21 exhibits were admitted.

{¶ 12} In April 2023, the magistrate issued a decision in which he recommended that father's complaint be granted, and father be designated the residential parent and legal custodian of the child. Mother filed objections.

{¶ 13} On October 31, 2023, the juvenile court issued its judgment. The court denied mother's objections on technical grounds and undertook a de novo review of the matter, considering the evidence in the trial transcript and the exhibits. The court found the magistrate's recommendation to designate father as the residential parent was "inconsistent with the fact that Father . . . never appropriately fulfilled his responsibility to pay child support and it [was] not in the child's best interests to allocate primary responsibilities to one who has shown a disregard for [his] responsibilities." The court denied father's complaint, in part as to custody, and granted the complaint, in part as to visitation. The court ordered that mother be the residential parent and legal custodian of the child, and father was entitled to visitation with the child, either by agreement of the parties or pursuant to the court's standard schedule for parenting time.

4.

{¶ 14} Father appealed the custody determination.

**R.C. 3109.04**

{¶ 15} R.C. 3109.04 sets forth the provisions for the allocation of parental rights and responsibilities. When making such an allocation, the juvenile court "shall take into account that which would be in the best interest of the child[]." R.C. 3109.04(B)(1). In determining the best interest of a child, R.C. 3109.04(F)(1) provides that the juvenile court "shall consider all relevant factors, including, but not limited to" the following:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers . . . regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor . . . [.]

**Juv.R. 40**

{¶ 16} Juv.R. 40 governs magistrate's decisions and the procedure for filing and ruling on objections to a magistrate's decision in juvenile cases. Relevant here, Juv.R. 40(D)(3)(b) (ii) provides that "[a]n objection to a magistrate's decision shall be specific and state with particularity all grounds for objection." Juv.R. 40(D)(4)(d) states "[i]f one or more objections to a magistrate's decision are timely filed, the court shall rule on those objections. In ruling on objections, the court shall undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law."

**Magistrate's Decision**

{¶ 17} The magistrate authored a detailed and comprehensive decision. Regarding child support, the magistrate found father violated the juvenile court's January 14, 2015 support order. The magistrate noted, as a possible defenses, father testified on cross-examination that he missed some support payments because he had to spend his money to buy the child clothes, shoes and such, and father also stated that although the child was living with him, father was required to pay support because father did not protest it. The magistrate determined that father did not establish that he did not have the ability to comply with the child support order, and that father was in contempt of court. The

6.

magistrate noted R.C. 2705.02 defined acts of indirect contempt as "'[d]isobedience of, or resistance to, a lawful . . . order, rule, judgment, or command of a court or officer[.]'" The magistrate set forth that "[c]ontempt is a willful violation of a court order."

{¶ 18} Concerning custody, the magistrate summarized the testimony presented at trial and recommended that father be designated the residential parent and legal custodian of the child because the child had a better support system when he was with father.

{¶ 19} The relevant portions of the summarized testimony of the parties follows.

**Father**

{¶ 20} Father testified he was 40 years old, has lived with his parents most of his life, and has one child. He was self-employed and worked with a partner doing concrete and excavation every day, weather permitting. Father drew $300 per week and his current income was around $30,000 per year.

{¶ 21} The child was born in 2012, and father's relationship with mother was up and down. The child stayed with father while mother worked because he had a flexible work schedule, so he took the child to doctor appointments and activities. Father and his dad "always" took the child to the doctor, while mother only took the child a few times.

{¶ 22} The child went to school #1 for kindergarten, where mother worked as a pre-school teacher. The next year and a few years thereafter, the child went to school #2, since that was the district where father lived with his parents, and his dad got the child on and off the school bus. Father saw the child every day and the child did great in school.

7.

{¶ 23} In December 2021, father dropped the child off at mother's house. Mother then called father and told him he could not get the child back, she took the child out of school #2, put him in school #3 (which was in a different town about one hour from where father lived), she moved to that town, and got a job in school #3. Father said the child was upset and cried. Father had no idea mother was moving until she called him that day, although she kept saying she was going to move, but he thought she was joking.

{¶ 24} Father was concerned with several things: (1) he believed the child rode his bike unsupervised on the state route where mother lived because when father called mother, she told him the child was outside riding his bike; (2) mother's 20-year-old son, Z., the child's half-brother, lived with mother and had anger issues, a drug addiction and a criminal history, so father worried about the child's safety because he believed drugs were still in mother's house and Z.'s friends were in and out of the house; (3) the child has had chapped lips since he moved with mother, which father suspected was due to nerves and anxiety; (4) the child took a shower at father's parents' house before going to mother's house because he did not want to shower there; (5) the child got chiggers when mother took him on a trip to West Virginia, but she did not treat the chiggers, father did; (6) father believed mother did not have the child on a set schedule for dinner or bedtime; (7) father used to see the child daily but now saw him on Fridays and every other weekend, and the child was always exhausted on Fridays; (8) mother created a visitation schedule, without any discussion, for when he saw the child, which the child gave to him; and (9) the child did not play all of the sports year-round, like he had.

8.

{¶ 25} Father was also concerned that the child had a bruise on his back from one of mother's friend's kids who shoved the child into a wall and the child had a burn mark on his hand, which looked to father like a lighter burn. Although father recognized the child was active and engaged in lots of activities, including wrestling and riding ATVs, and he sometimes got cuts and scrapes, father still believed the child had a lighter burn.

{¶ 26} Regarding the child's schooling, father asked for information but was denied, and only saw report cards that the child brought to him. Father knew nothing about getting on Progress Book online to look at the child's grades, he did not believe he was given log-in information, but he did not call the school for the information because he thought mother should have provided that. Father has a computer.

{¶ 27} Father thought he was a better communicator regarding the child since he had made copies of all the child's schoolwork for mother and discussed the child's medical issues with her. He believed his household was better suited for the child since it was in the country, the child loved the outdoors, and he had a better support system for the child.

{¶ 28} Father testified he owed arrears in child support, but he had to buy the child clothes and could not afford the child support.

**Mother**

{¶ 29} Mother testified she lived in her current home, which she owned, for a little over one year, where the child had his own bedroom and a place for homework. She

9.

previously lived in a house, that she owned, for about 12 years, and when she listed it for sale, father knew she was moving.

{¶ 30} Mother was employed as a pre-school teacher and underwent FBI and BCI background checks for her job. She received a substantial raise when she accepted her current position, which helped to offset not receiving money from father, as he owed over $18,000 in child support. She shared she had been fired from a prior teaching position.

{¶ 31} There were rules in mother's home and the child had chores - everyone used only nice words, did not yell, were respectful of others and helped out, the child took out the trash and had a bedtime of 8:30 p.m.; the child abided by her rules. The child also had a routine, and on school nights, he had a bath and laid out his clothes for the next morning.

{¶ 32} Mother admitted Z. had troublesome issues in the past, and during his teenage years, she stuck up for him and helped him out of trouble. Z. had a chemical imbalance, was diagnosed with anxiety, and his troubles first started when his dad died. Now, she used tough love and Z. finally saw he needed to do different. Z. was consistently in counseling, which was court-ordered, and had a medical marijuana card, which seemed to help more than any other medicine he had. Z. also worked. Z. was on probation for almost two year and had no incidents or violations.

{¶ 33} The child had friends in the neighborhood, and they rode bikes, played kickball, baseball, football, tag, and went to the park. The child was in football, and he loved wrestling and baseball, so mother took him to those activities and father attended

10.

the games. The child's football and baseball buddies came to the house and stayed the night.

{¶ 34} The child spent time with mother's parents, who both have significant others, they spent holidays together, her parents came over at least three or four times a month, and her brother and nieces and nephews came over. Mother also had school friends who came over, and they had neighbor friends with whom they hung out.

{¶ 35} Regarding the child's schooling, father did not help the child when he was at school #2 nor did he presently help the child with homework. Father was unable to work the computer programs. Mother communicated parent-teacher conference information for school #3 to father. At school #3, most of the schoolwork was done in the classroom, but she helped the child with the computer assignments he had to do at home.

{¶ 36} Mother created a visitation schedule for the child, to which father agreed. The schedule was followed for the most part, and when father asked to change a weekend, mother accommodated him. She said the child loved father and had fun over where father lived. Yet, she believed she exercised more discipline than father did.

{¶ 37} Mother had issues with the house where father lived, which he did not own, due to the house's lack of cleanliness and dilapidated condition. The second-hand smoke dripped down the walls, as father and his parents smoked in the house, the water in the bathroom could not be turned on without a wrench, and the child's bedroom was also a storage room. In addition, mother had concerns for the child when he was at that house

11.

because: there were unlocked guns and ammunition stored under the child's bed, there was a lot of drinking in the home by father and his dad, father and his dad argued, there were holes in the living room wall where father and his dad got angry and punched the wall, and she was present for that once and called the sheriff because they would not let her and the child leave. Mother would be surprised to hear that house was remodeled.

{¶ 38} Mother wished to remain the child's custodial parent because she felt it was in his best interest, since the child had been with her 10 years, she kept his grades up, they had a routine, and he was happy and thriving. She believed father wanted custody so she would have to pay child support and medical. She did not agree that father bought the child a lot of clothing and paid for sports, as father bought some sweatshirts and things here or there, but she provided the bulk of the child's clothing, and she paid for sports.

### Juvenile Court's Judgment Entry

{¶ 39} The court found the magistrate properly recommended that father be held in contempt for willfully failing to abide by the support orders. The court approved the recommendation and found father in contempt.

{¶ 40} Regarding father's complaint for parentage, it was "evident to the Court that the determination of the child's best interest was a close call and contingent upon the determination of the credibility of the witnesses and the weight of the evidence." The court noted the evidence established that the child was "quite well adjusted," was a "good student including being a gifted student and has been involved in numerous extra-

12.

curricular and outdoors activities." The child "has relationships with numerous family members in both Mother[] and Father's families. This is clearly because the parties shared many responsibilities previously."

{¶ 41} The court noted the magistrate relied heavily on the factor concerning the child's interactions with family and others who may significantly affect best interests, in arriving at his recommendations, and the court set forth "[t]he evidence clearly established that Father's home would be marginally preferable. This is based mostly on two facts, one, that [the child] spent a majority of his time with Father over the period covering first through the middle of third grade. The second fact is the evidence surrounding [Z.], who lives in Mother's home." The court observed mother was "permitting open and illegal use of drugs and alcohol in the home in the presence of [the child] and [Z.] has significant mental health and criminal issues and Mother appears to be doing nothing to insulate or protect [the child] from this or to require [Z.] to meaningfully and appropriately address his problems." Yet, the court also acknowledged that "Father's home (or more accurately his parents['] home) is not perfect either, as apparently Father and/or his parents are heavy tobacco smokers and Father suffers from a severe lack of ability with (or resistance to) the technology that [the child] needs and that would permit father to more effectively communicate with the schools and others."

{¶ 42} In its review, the court found that the magistrate failed to place the proper weight on the child support payment factor since father had been significantly non-compliant with his support responsibility, and he paid less than half of his orders over the

13.

child's lifetime. The court found child support "is a core parental responsibility and Father has shown little interest in living up to it. This not only establishes that he is not fully willing to accept all responsibilities for his child[,] but it also undermines his overall credibility on all other matters." The court further found that father's "contempt (willful violation) also establishes that [he] is less likely to honor court orders, namely court ordered visitation, a factor contained in R.C. 3109.04(F)(1)(f)."

{¶ 43} The court recognized that father "says he didn't pay child support because he had the child in his primary care for a time (1st thru part of 3rd grade)[,] but this doesn't explain why he has not paid at other times." The court found it was "not consistent with [father's] knowledge of his court orders as they inform him that any direct payments are gifts[, nor was it] . . . consistent with his own testimony about his living arrangements (living with parents) and his finances." The court set forth that mother "testified that she moved in large part because Father doesn't pay the child support obligation and she needed a better paying job, yet the reason Father filed this Motion is because Mother moved. Father caused the move, at least in part, by his failure to meet his statutory and Court ordered responsibility of support[,] and this is the most direct evidence we have in the case concerning parental responsibilities."

{¶ 44} The court found that designating father as the residential parent was "inconsistent with the fact that Father . . . never appropriately fulfilled his responsibility to pay child support and it [was] not in the child's best interests to allocate primary responsibilities to one who has shown a disregard for [his] responsibilities." Nonetheless,

14.

the court found that father's request to have companionship/visitation with the child was clearly in the child's best interest.

**Standard of Review**

{¶ 45} Juvenile courts possess broad discretion in custody matters, thus a "court's judgment on custody is subject to review on appeal under an abuse of discretion standard. *Miller v. Miller*, 37 Ohio St.3d 71, 74 . . . (1988)." *N.E. v. J.E.*, 2017-Ohio-6917, ¶ 16 (6th Dist.). An abuse of discretion connotes that the trial "court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). An abuse of discretion involves more than a difference in opinion, as the term discretion involves the idea of a choice, of an exercise of will or of a decision reached between opposing considerations. *State v. Jenkins*, 15 Ohio St.3d 164, 222 (1984). In order for an appellate court to reach a finding that a trial court abused its discretion, a trial court's judgment must be so profoundly and wholly violative of facts and reasons such that it evidences the perversity of will, rather than the exercise of will, and the defiance the exercise of judgment, not the exercise of judgment, and the exercise of passion or bias, not reason. *State v. Weaver*, 2022-Ohio-4371, ¶ 24.

{¶ 46} A trial court also has the discretion in custody matters, when considering the best interest factors listed in R.C. 3109.04(F), to decide which facts are relevant, and the proper weight to give to the relevant factors. *Brammer v. Brammer*, 2013-Ohio-2843, ¶ 41 (3d Dist.), citing *Hammond v. Harm*, 2008-Ohio-2310, ¶ 51 (9th Dist.). An appellate court will not second-guess a trial court's decision regarding the appropriate

15.

weight to assign to the best interest factors. *Bonifield v. Bonifield*, 2021-Ohio-95, ¶ 13 (12th Dist.).

## Assignment of Error

{¶ 47} Father argues the trial court abused its discretion when it made conclusions which were unreasonable, arbitrary and unconscionable, and not based on evidence and testimony adduced at trial, and the court improperly weighted the best interest factors.

{¶ 48} Father allows that the evidence presented, without controversy, showed he was in arrears in his child support obligation, but he argues that was just one factor to consider in reaching a best interest conclusion, as directed in R.C. 3109.04(F)(1). He submits that child support was first established when the child was three years old, which "does explain, to some extent, the Judge's questioning in his Judgment Entry as to why the early years of child support were not paid. There was no Order." Father asserts when the child "was attending school from [father's] home by the first grade, where he remained until December, 2021[,] . . . [father] was paying for the child's needs directly during those years in food, clothing, etc., as the child was in his home daily." Father "should have pressed at that time to address the matter of the running meter of child support . . . but [he] found himself in a hole of support."

{¶ 49} Father argues the child was by all counts happy, healthy, and academically successful prior to the mother's move, but afterward, the child outwardly shows signs of distress: the "continual anxiety habit of sucking his lips which . . . leaves them chapped . . . a condition he never previously [had]; a child who now is avoiding showering at his

Mother's home[;] a child who presents with . . . chiggers and not being taken to the doctor by Mother and Father no longer having access to the child as he did[;] and a burn mark Father observed on the child's arm[.] Yet, the Trial Court Judgment Entry is only concerned with child support."

{¶ 50} Father claims the court "further jumps to unfounded conclusions" that because an arrears of child support exists, he "is less likely to honor court orders for visitation." Father insists "[t]here is no connection here. There is no testimony that Father has missed a beat for this child."

{¶ 51} Father asserts that the "judge's conclusion that the child's best interest is best served by remaining in a household that is riddled with open drug and alcohol use is unreasonable and unconscionable. The Judge somehow barely acknowledges conditions in [mother's] home that the Magistrate Decision describes as a 'Cheech and Chong Movie.'" Father contends the magistrate correctly identified "what should be the obvious concern, and biggest best interest factor in this case: The environment in [mother's] home . . . [where the child] resides and has the largest exposure[.] . . . [B]ut the Judge concludes best interest lies with child support."

{¶ 52} Father argues his "home provided a safe, consistent environment in which the child flourished[,] . . .[but mother's] home environment places the child at risk in various ways, that cannot be glossed over or lessened by any other factor, certainly not money."

17.

**Analysis**

{¶ 53} Upon review, the record includes testimony and evidence concerning the child, the child's half-sibling, the child's interaction with family members, the amount of time the child spent with each parent, the child's school performance, activities, interests and routines, and child support orders. The record also includes evidence regarding each parent's living situation, support systems, work, and work schedules. Specifically, father lived with his parents most of his life, in a house owned by the parents, while mother owned her own home, and at each parent's household there were issues and concerns. Father was self-employed making $30,000 a year, while mother was a teacher, and she received a substantial raise when she accepted her current job. The raise helped mother offset the money she did not receive from father, who owed over $18,500 in support. Father had been held in contempt and jailed for 10 days for failing to pay child support.

{¶ 54} Father's excuses for failing to pay his child support obligations were that he could not afford to pay support because he bought the child clothes and other items, and that he could afford to pay support but chose not to pay child support "on the part he [the child] needed clothes."

{¶ 55} The juvenile court, in its judgment entry, clearly and succinctly set forth the evidence upon which it relied in reaching the decision to grant custody of the child to mother, and the court provided explanations for the weight it allotted to the relevant best interest factors. The court found father filed his motion for custody because mother moved, yet father caused the move, in part, by failing to meet his court-ordered child

18.

support obligation, which was "the most direct evidence we have in the case concerning parental responsibilities." The court reasoned "[t]his not only establishes that [father] is not fully willing to accept all responsibilities for his child but it also undermines his overall credibility on all other matters . . . [and] Father's contempt (willful violation) also establishes that [he] is less likely to honor court orders, namely court ordered visitation."

{¶ 56} Father takes issue with the weight that the juvenile court gave to the best interest factors, but we find, based on the record and the applicable law, that the juvenile court properly undertook an independent review and analysis of the magistrate's decision, considered the best interest factors which impacted the child, weighed those factors based on the evidence, and reached the decision that it was in the child's best interest for mother to be the residential parent and legal custodian.

{¶ 57} The juvenile court recognized that the magistrate relied heavily on the best interest factor concerning the child's interactions with family and others (R.C. 3109.04(F)(1)(c)), and the court found that the evidence showed father's home would be marginally preferable. However, the court decided to place greater emphasis on the child support and the likelihood to honor court orders factors (R.C. 3109.04(F)(1)(f) and (g)) than the magistrate did, which was well within the court's discretion. We will not second-guess the juvenile court's decision in this regard.

{¶ 58} We therefore conclude that the juvenile court did not act in an unreasonable, arbitrary, or unconscionable manner in its decision to designate mother the

19.

residential parent and legal custodian of the child, rather than father.  Accordingly, father's assignment of error is found not well-taken.

{¶ 59} We affirm the judgment of the Erie County Court of Common Pleas, Juvenile Division.  Father is ordered to pay the costs of this appeal, pursuant to App.R. 24.

Judgment affirmed.


A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


| | |
|---|---|
| Gene A. Zmuda, J. | _____ |
| | JUDGE |
| Myron C. Duhart, J. | |
| | _____ |
| Charles E. Sulek, P.J. | JUDGE |
| CONCUR. | |
| | _____ |
| | JUDGE |

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.